John B. HURLEY, an individual and citizen of Michigan; Julian L. Potts, an individual and citizen of Michigan; Stuart G. Garson, an individual and citizen of Michigan; Dale R. Campbell, an individual and citizen of Michigan; Peter A. Dow, an individual and citizen of Michigan; Oliver L. Fretter, an individual and citizen of Michigan; Ernest L. Grove, Jr., an individual and citizen of Michigan; Brian K. Friedman, an individual and citizen of Pennsylvania; Daniel C. Hourigan, an individual and citizen of California; and Robert N. Shrager, an individual and citizen of the United Kingdom, Plaintiffs,

v.

COLUMBIA CASUALTY COMPANY, an Illinois Corporation, Defendant.

Civil Action No. 96–488 MMS.

United States District Court,
D. Delaware.

Aug. 8, 1997.

269

Stephen W. Spence, Phillips, Goldman & Spence, P.A., Wilmington, DE (Daniel J. Voelker, William N. Howard, Christopher E. Paetsch of Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, of counsel), for plaintiffs.

Lawrence C. Ashby, John S. Grimm of Ashby & Geddes, Wilmington, DE (Theodore

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### INTRODUCTION

Plaintiffs in this suit are a number of former officers and directors of Fretter, Inc. ("Fretter"), a Michigan-based company that has filed for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Plaintiffs filed a complaint against Columbia Casualty Co. ("Columbia") seeking a declaratory judgment that a Directors and Officers liability insurance policy ("the Policy") issued by Columbia to Fretter will cover them in litigation threatened by several corporate subsidiaries of Fretter (the "Silo entities"), which also have filed for Chapter 11 protection. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332. Columbia has filed a motion to dismiss, or, in the alternative, for summary judgment; it argues the insurance policy unambiguously excludes coverage in this case. Plaintiffs opposed this motion, and also filed a motion to withhold consideration of, and ruling on, Columbia's motion. For the reasons that follow, the Court will dismiss plaintiffs' complaint.

### FACTS

On September 24, 1996, Fretter filed a petition for relief under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Northern District of Ohio. The Silo entities had filed for protection under Chapter 11 on December 4, 1995, in the U.S. Bankruptcy Court for the District of Delaware, and a creditors' committee subsequently was appointed.

In June 1996, the debtors in possession of the Silo entities forwarded to the former Fretter officers and directors—the plaintiffs in the present case—a draft of a complaint naming them as defendants in a lawsuit.[1]

The draft complaint asserted the plaintiffs participated in fraudulent conveyances, illegal dividend payments and breaches of fiduciary duty. Apparently, the draft complaint was provided to the plaintiffs in an effort to an achieve out-of-court settlement of the claims. The plaintiffs submitted the draft complaint to Columbia on June 20, 1996.

On July 12, 1996, Columbia informed plaintiffs there was no coverage under their liability policy for this threatened lawsuit based on an exclusion in the policy, which has been referred to as the "Insured v. Insured" exclusion. The language of that exclusion reads:

> The Insurer shall not be liable to pay any Loss ... in connection with any Claim made against the Directors and Officers:
>
> \* \* \* \* \* \*
>
> 8. by, on behalf of, or for the benefit of the **Entity**, or by any security holder of the Entity, whether directly or derivatively, except where such Claim is made by an Independent Security Holder....

Policy § IV.8.B. "Entity" is defined in the insurance policy as Fretter and any of its subsidiaries. *Id.* § II.E. Despite its position the plaintiffs are not covered under the policy, Columbia forwarded money to the plaintiffs for their defense for several months beginning in December 1996. However, at oral argument on these motions, the parties informed the Court that such payments had ceased.

The plaintiffs filed this declaratory judgment action on October 4, 1996. On the eve of oral argument on the present motions, which took place May 30, 1997, plaintiffs filed a motion to amend their complaint because they had received an amended copy of the draft complaint in the underlying lawsuit. D.I. 27. The Court granted plaintiffs' motion; however, as far as the Court is aware, the Silo entities have not yet filed their draft complaint in any court. As it stands, the amended complaint names both the Silo entities as well as the Silo entities' creditors' committee as plaintiffs. Similar to the first

---

1. Under Chapter 11 of the Bankruptcy Code, a debtor may continue to run its business after reorganization has begun; such a debtor is called a "debtor in possession." The debtor in possession has similar rights and duties to a bankruptcy trustee. Benjamin Weintraub and Alan Resnick, *Bankruptcy Law Manual* § 8.08 (4th ed.1996).

draft complaint, it asserts claims of fraudulent conveyances, voidable preferences and breach of fiduciary duty.

## DISCUSSION

### I. Columbia's Motion to Dismiss and/or for Summary Judgment

Columbia, by its motion, asks the Court to hold the language of the Policy is unambiguous, and as a matter of law it does not provide coverage in the threatened lawsuit. Columbia argues that all recovery in the threatened lawsuit would be gained "on behalf of" the Silo entities—all subsidiaries of Fretter—and therefore, the threatened lawsuit falls under the "Insured v. Insured" exclusion to the policy. In support of that proposition, Columbia asserts the claims pressed in the draft complaint all inure to the Silo entities as a matter of corporate law; thus, they must be brought "on behalf of" those entities.

Plaintiffs respond with a number of arguments why the claims in the draft complaint are not brought "on behalf of" the Silo entities. For example, they argue, it is likely the threatened lawsuit will not solely be brought by the debtor in possession, but instead by some combination of entities including creditors. Alternatively the plaintiffs argue, even if the threatened litigation is brought by the debtor in possession, that entity, under bankruptcy law, is a separate and different entity than the Silo entities. At a minimum, the plaintiffs urge, the language of the policy is ambiguous and must be construed in their favor. The plaintiffs conclude by requesting the Court withhold consideration of Columbia's motion, on the grounds the " 'claim' still involves a number of unknowns." D.I. 14, at 25. Specifically, plaintiffs state:

> [I]t is not clear yet who will file the suit, what claims will be raised, where the suit will be filed or what substantive laws will apply. The threatened Delaware action may ultimately be brought against Plaintiffs herein by the Creditor's Committee, a creditor, a trustee in bankruptcy, another third-party or the debtors in possession.... The actual causes of action asserted against Plaintiffs herein may

change and, indeed, a creditor or third party may actually bring their claims in their own names.

Columbia's motion to dismiss is governed by Federal Rule of Civil Procedure 12(b)(6), and "may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief.... 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1420 (3d Cir.1997) (citation omitted).

Summary judgment, on the other hand, is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). To avoid summary judgment, "the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. American States Life Insurance Co.,* 10 F.3d 144, 148 (3d Cir.1993).

### II. Choice of Law

██ Columbia's motion raises the issue of whether the insurance policy is ambiguous. In so deciding, Columbia asserts the Court must apply Michigan law. The plaintiffs, as one basis for their motion to have the Court postpone decision on Columbia's motion, urged the record is not sufficiently developed on the issue to determine which law applies. At oral argument on these motions, the Court granted the parties 30 days for discovery on the issue of applicable law. After considering the post-discovery briefing on the issue of applicable law, the Court holds Michigan law will govern the contract interpretation in this case.

██ Because it is sitting in diversity, this Court follows the choice of law rules of the state of Delaware. *Carrick v. Zurich–American Ins. Group,* 14 F.3d 907, 909 (3d

Cir.1994). Delaware courts have adopted the "most significant relationship" test for determining which law to apply in contract cases. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41 (Del.1991); *accord Naghiu v. Inter–Continental Hotels Group, Inc.*, 165 F.R.D. 413, 419–20 (D.Del.1996); *Falkenberg Capital Corp. v. Dakota Cellular, Inc.*, 925 F.Supp. 231, 235 (D.Del.1996).

Under the most significant relationship test, the following factors are evaluated: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance of the contract, (d) the location of the subject matter of the contract, and (e) the domicile, residence, or place of incorporation and place of business of the parties. *Naghiu*, 165 F.R.D. at 420 (citing Restatement (Second) of Conflicts § 188 (1971)).

Columbia has submitted an affidavit of Mark LaChance, the underwriter for the policy at issue in this case. *See* D.I. 34, Exh. A. According to LaChance, the policy was negotiated from his office in New York with Fretter's insurance broker, who was located in Michigan. *Id.* ¶ 3. LaChance also asserts he signed the policy in New York; the policy was subsequently delivered to Fretter's broker in Michigan. *Id.* ¶ 6, 7. Fretter is a Michigan corporation and most of the plaintiffs—the officers and directors of Fretter—are residents of Michigan. D.I. 27, Exh. A. Columbia, on the other hand, is an Illinois corporation with its principal place of business in Illinois. *Id.*

Plaintiffs' position that the contract is governed by New York law is based on the fact Columbia's representative La Chance negotiated and signed the contract on behalf of Columbia in New York. D.I. 36. However, these limited contacts with New York do not compel the conclusion New York has the most significant relationship with the contract at issue. While Columbia negotiated and executed the policy in New York, Fretter negotiated it and executed it in Michigan. Moreover, Michigan is the state of incorporation and principal place of business of Fretter and it is the domicile of the officers

and directors who are the subject of the contract. Michigan therefore has a more significant relationship with the contract than does New York.

## III. Ripeness

 As an initial matter, plaintiffs' position that the Court should withhold ruling on Columbia's motion to dismiss based on the uncertainty surrounding the underlying action alerts the Court to the possibility that plaintiffs' action for a declaratory judgment is not ripe for determination. The Court may raise the issue of ripeness sua sponte because its subject matter jurisdiction is implicated. *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 535 (3d Cir.1988). The ripeness doctrine stems from the requirements of Article III of the U.S. Constitution, which prohibits federal courts from issuing advisory opinions. *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 410 (3d Cir. 1992). The ripeness inquiry focuses on the timing of the plaintiffs' suit. *Id.* at 411. "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id.* (quoting *Abbott Labs., v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)).

 The plaintiffs filed their lawsuit under the Declaratory Judgment Act, 28 U.S.C. § 2201.[2] Because "declaratory judgments are issued before 'accomplished' injury can be established," the ripeness requirement in the context of a declaratory judgment action presents a particularly difficult issue. *Step–Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 646–47 (3d Cir.1990). Nevertheless, the requirement remains, and "[t]he discretionary power to determine the rights of parties before injury has actually happened cannot be exercised unless there is a legitimate dispute between the parties." *Id.* at 647.

The Supreme Court has explained:

The difference between an abstract question and a controversy contemplated by

---

2. "In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought...."

the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

The Third Circuit Court of Appeals has employed two different tests to determine the question of ripeness in the context of a declaratory judgment. Most recently, in *Artway v. Attorney General,* 81 F.3d 1235, 1247 (3d Cir.1996), the court utilized the two-prong test of *Abbott Labs.,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, under which courts are directed to weigh "(1) the hardship to the parties of withholding court consideration; and (2) the fitness of the issues for judicial review." On the other hand, in *Armstrong,* 961 F.2d at 411, the court used a three-prong test: whether there is (1) "adversity of interest" between the parties, (2) the "conclusivity" that a declaratory judgment would obtain and (3) the "practical help or utility" of a declaratory judgment.

The Third Circuit Court of Appeals' opinion in *ACandS, Inc. v. Aetna Casualty and Surety Co.,* 666 F.2d 819 (3d Cir.1981), is relevant to the present case. The court reversed a district court's dismissal for lack of ripeness of a declaratory judgment action brought by an insured to determine coverage and duty to defend. The insured, ACandS, had been named in a large number of suits claiming injury from asbestos. ACandS was insured by two different carriers during the period of time at issue, and each carrier subscribed to a different theory to determine which would indemnify for which suits. The district court dismissed on the basis there was no ripe dispute between the parties because the plaintiff had not yet become liable to pay any judgments.

The appellate court found the case was ripe for determination. It found the counts of ACandS' complaint alleging tortious conduct by the insurers to be a justiciable controversy. It then stated, "If issues of contract interpretation occur in the context of a justiciable case or controversy—e.g. the damage action here—they must be considered by the federal court." 666 F.2d at 822. The court further opined that the coverage issues were also ripe despite the fact there was no liability yet in the underlying suits. It stated, "Declaratory suits to determine the scope of insurance coverage have often been brought independently of the underlying claims albeit the exact sums to which the insurer may be liable to indemnify depend on the outcome of the underlying suits." *Id.* at 823 (citing cases). Further, the court found the insurers' contractual duty to defend the insured in the underlying suits also was ripe. *Id.*

The plaintiffs in the present suit seek a judgment declaring "that Plaintiffs are entitled to an advance of defense costs and coverage under Directors and Officers Policy No. 400714366 issued by Columbia ..." D.I. 27 (second amended complaint). Similar to *ACandS,* the plaintiffs urge a present dispute exists with respect to Columbia's current obligation to advance defense costs to them. Columbia counters by arguing its obligation to advance defense costs is co-extensive with its obligation to indemnify; in other words, its position is, if the effect of the "Insured v. Insured" exclusion obviates the duty to indemnify, it also negates the obligation to advance defense costs. Columbia then urges the applicability of the exclusion is an issue of contract interpretation necessary to the resolution of the parties' dispute. The Court first will consider whether the parties have presented a live controversy with respect to defense costs, and then whether resolution of that controversy necessarily requires interpretation of the "Insured v. Insured" exclusion in the Policy.

### A. Defense Costs

■ The analysis of Columbia's current obligation to advance defense costs begins with the language of the policy. Most direct-

ly pertinent is Section VI.E., entitled, "Advancement of Defense Costs and Payment of Loss on Behalf of the Directors and Officers." That provision essentially provides Columbia agrees to advance defense costs to the directors and officers in the event of Fretter's financial insolvency. The precise language is:

> If the Entity does not advance Defense Costs or indemnify the Directors and Officers for Loss in connection with any Claim made against them by reason of (i) Financial Insolvency ... then, the Insurer on behalf of the Directors and Officers shall advance prior to the final disposition of such Claim all such Defense Costs....

Several definitions also are relevant. For example, as noted above, the "Entity" is defined as Fretter or any subsidiary. Policy § II.E. "Loss" is defined as "damages, settlements, judgments and Defense Costs." *Id.* § II.J. "Claim" is defined as "(1) a civil, criminal or administrative adjudicatory proceeding, or (2) a written demand for monetary damages." *Id.* § II.B.

The Court agrees with the parties' unified position that the draft complaint submitted to the plaintiffs constitutes a written' demand for monetary damages under prong (2) of the definition of a claim. Therefore, because Fretter is financially insolvent, plaintiffs have argued, Columbia presently is required under the Policy to advance defense costs to the plaintiffs. As Columbia disclaims this obligation, it is clear the parties have presented a ripe controversy, at least with respect to Columbia's current obligation to advance defense costs. *See ACandS*, 666 F.2d at 823 ("The obligation to defend is a current one as to which the parties are in conflict.... This court and others have by now well established that a disagreement on the insurers' obligations to defend is a 'case or controversy.' ").

## B. Indemnification

■ At the same time they urge the Court there is a ripe dispute between the parties as to defense costs, plaintiffs ask the Court to withhold consideration of the issue of coverage until the underlying lawsuit is filed, because it is difficult to determine whether the "Insured v. Insured" exclusion applies. For example, they note, it is unclear who will bring the suit, and which claims will be asserted. On the other hand, plaintiffs ask that Columbia be ordered to continue to advance defense costs until such a determination can be made. In essence, plaintiffs argue Columbia has assumed a "duty to defend" that is broader than its ultimate duty to provide indemnification for losses covered by the Policy. The Court disagrees.

■ Plaintiffs are correct; Michigan law distinguishes between a "duty to defend" and a duty to indemnify. *See Auto Owners Ins. Co. v. City of Clare*, 446 Mich. 1, 521 N.W.2d 480, 487 (1994). However, under Michigan law the duty to defend is broader than the duty to indemnify *only* in the sense that the duty to defend "arises in instances in which coverage is even arguable, though the claim may be groundless or frivolous." *Id.* The distinction is therefore based on the temporal difference between a duty to defend, which arises before litigation is completed, and the duty to indemnify, which arises only after a finding of liability.

The Supreme Court of Michigan has adopted the following quotation to explain the difference between the duty to defend and the duty to indemnify:

> The duty to defend does not depend upon the insurer's liability to pay, however since the insurer's duty to defend stems from its own contractual obligation to the insured, while its ultimate liability to pay on behalf of the insured depends upon the [substantive law], and since the usual policy provisions requiring the insurer to defend cannot be construed to impose such a duty only in the case of successful suits against the insured. Accordingly, the insurer may be obligated to defend although not held liable to pay. In other words, the insurer may be obligated to defend so-called "groundless" suits—namely, suits the allegations of which bring them within the coverage of the policy, but which are decided in favor of the insured.

*American Bumper and Manufacturing Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 550

N.W.2d 475, 481 (1996) (quoting 44 Am. Jur.2d *Insurance* § 1539 (1969)).

■ There is no common law duty to defend, however; such a duty must spring from the language of the contract. 2 William E. Knepper and Dan A. Bailey, *Liability of Corporate Officers and Directors* § 19–3 (5th ed.1993). The Policy at issue in the present suit does not contain typical "duty to defend" language found in policies other than Directors and Officers liability policies. *See Continental Casualty Co. v. Board of Education*, 302 Md. 516, 489 A.2d 536, 542 (1985) (comparing language "the Company shall defend any suit against the Insured alleging such bodily injury ... even if any of the allegations of the suit are groundless ..." with typical language in a Directors and Officers liability policy). Moreover, the substance of the Policy is different than the typical "duty to defend" provision; whereas, in a policy assuming a duty to defend, the insurer selects and retains defense counsel, and the cost of the defense is not charged against the policy limits, under the Policy, the insured directs the litigation and the costs of defense are charged against the policy limits. *Id.* Finally, the policy specifically disclaims the insurer has a duty to defend: "The Directors and Officers and not the Insurer have the duty to defend Claims." Section VI.B. Thus, it cannot be said Columbia assumed the traditional duty to defend.

The Court is unable to find any decision of a Michigan Court that opines on the duty assumed in a Directors and Officers policy where the insurer commits to advance defense costs but does not explicitly assume the duty to defend. However, given the undertaking to advance defense costs, the Court finds for the limited purpose of this motion there does not exist a significant difference between the duty to defend and the promise to advance defense costs, other than the difference between who will direct the defense. As noted above, the duty to defend is broader than the duty to indemnify only in that it requires the insurer to provide a defense even for claims which ultimately are held meritless. The agreement to advance defense costs must be similarly interpreted; as noted by the Michigan Supreme Court, it would be an anomaly to require Columbia to advance defense costs only for meritorious claims.

■ Neither the duty to defend nor the undertaking to advance defense costs compels Columbia to pay defense costs on a claim that is not covered by the Policy. For while the duty to defend arises "[i]f the allegations of a third party against the policyholder even arguably come within the policy coverage[,]" nevertheless, the duty to defend "arises only with respect to insurance afforded by the policy. If the policy does not apply, there is no duty to defend." *American Bumper and Manufacturing Co.*, 550 N.W.2d at 481.

Therefore, the Court rejects the plaintiffs' position that Columbia should be ordered to advance defense costs until some future determination is made as to policy coverage. The Court further notes plaintiffs' position that the Court should defer decision on Columbia's motion to dismiss adds to its conviction that, although the case is ripe for determination as discussed above, the Court should exercise its discretion under the Declaratory Judgment Act and decline to adjudicate the parties' rights at this time.

## IV. The Court's Discretion under the Declaratory Judgment Act

■ The Supreme Court has made clear that "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282, 115 S.Ct. 2137, 2140, 132 L.Ed.2d 214 (1995). The Third Circuit Court of Appeals has set forth factors for district courts to consider in deciding whether to exercise their discretion in favor of granting a declaratory judgment. *United States v. Commonwealth of Pennsylvania*, 923 F.2d 1071 (3d Cir.1991). The considerations are:

(1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy;

(2) the convenience of the parties;

(3) the public interest in settlement of the uncertainty of obligation; and

(4) the availability and relative convenience of other remedies.

*Id.* at 1075 (citations omitted). *Wilton*, as well as *U.S. v. Commonwealth*, both involved the question of whether a district court should exercise discretion to grant a declaratory judgment while a related state action was pending; therefore, they are not directly applicable to the case at hand.

However, the Court is convinced under consideration (1) of *U.S. v. Commonwealth* that it should decline to adjudicate the rights of the parties, because it is far from clear a declaration at this stage in the proceedings will resolve the parties' differences and forestall future disputes. The Court's reluctance to issue declaratory relief at this time is best understood when it is realized there is no way to state with certainty what the status of the present debtor in possession will be at the time suit is filed. For example, the Chapter 11 reorganization might conclude with confirmation of a plan of reorganization. In that instance, the debtor or the entity emerging from the reorganization would probably have to be included as a plaintiff. On the other hand, it is equally possible that the status of the Chapter 11 debtor in possession could be changed to a Chapter 11 liquidation or a conversion to a Chapter 7 liquidation. In the latter two instances, it is presently unknown who the plaintiff would be. Among the possibilities are a plan committee, a creditors committee, a trustee for the bankrupt estate, or some other special trustee.

Complicating the liquidation scenario is a possibility that the fertile mind of the bankruptcy practitioner might come up with other devices to directly avoid the consequences of the "Insured v. Insured" exclusion. An illustrative effort may be found in *Pintlar Corp. v. Fidelity and Casualty Co. (In re Pintlar)*, 205 B.R. 945 (Bankr.Idaho 1997). In *In re Pintlar*, the Chapter 11 debtor in possession entered into a trust agreement whereby its claims under a Directors and Officers' liability policy were assigned to a trustee, and the debtor in possession was forever excluded from receiving the proceeds of the insurance.

The court held the "Insured v. Insured" exclusion did not apply, given that the trustee brought suit on behalf of the creditors, not the corporation.

A determination as to the parties' rights under the *present circumstances* could be rendered useless if the underlying suit is subsequently filed in the name of a new and different plaintiff than that currently proposed. This is so because the identity of the plaintiff in the underlying suit is crucial to the applicability of the "Insured v. Insured" exclusion, and until the underlying suit is filed that identity will remain uncertain. While Columbia takes the position that the exclusion applies regardless of the identity of that plaintiff in the underlying suit, the Court simply cannot accept that argument given the broad universe of potential named plaintiffs. It is for this reason the Court declines to exercise its declaratory judgment jurisdiction.

## CONCLUSION

The Court has held the matter is ripe for adjudication, notwithstanding the declination of exercise of declaratory judgment jurisdiction analysis might indicate it is not ripe under the *Armstrong* three-prong test. *See* 961 F.2d at 411 (requiring "adversity of interest"; "conclusivity"; and "practical help and utility"). There is clearly an adversity of interest between the parties. However, a strong argument could be marshaled—in light of the uncertainty as to the identity of the plaintiff in the lawsuit to be filed—as to whether the requisite conclusivity and practical help or utility would be obtained. If Columbia's argument had been accepted on the merits, i.e., that the "Insured v. Insured" exclusion applies regardless of who the named plaintiff might be, it is clear the ripeness criteria would be satisfied. However, the Court having rejected that position, the criteria are not satisfied. It is because of this circumstance that the Court, while recognizing ripeness could be a close question, has exercised its discretion to decline to award declaratory relief, rather than find a constitutional barrier to deciding this case.