**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| MEDICAL DEPOT, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. N15C-04-133 EMD CCLD |
| | ) |
| RSUI INDEMNITY COMPANY, | ) |
| | ) |
| Defendant. | ) |

Submitted: June 22, 2016
Decided: September 29, 2016

*Upon Plaintiff Medical Depot, Inc.'s Motion for Summary Judgment*
***GRANTED in Part and DENIED in Part***

*Upon Defendant RSUI Indemnity Company's Motion for Summary Judgment*
***GRANTED in Part and DENIED in Part***

Jamie L. Edmonson, Esquire and Daniel A. O'Brien, Esquire, Venable LLP, Wilmington, Delaware, Michael C. Davis, Esquire, Venable LLP, Washington, District of Columbia and Edmund M. O'Toole, Esquire, Venable LLP, New York, New York. *Attorneys for Medical Depot, Inc.*

James W. Semple, Esquire, and R. Grant Dick IV, Esquire, Cooch and Taylor, P.A., Wilmington, Delaware, and Michael R. Delhagen, Tressler LLP, New York, New York. *Attorneys for RSUI Indemnity Company.*

**DAVIS, J.**

## INTRODUCTION

This is a civil action assigned to the Complex Commercial Litigation Division of the Court. By way of a complaint, Plaintiff Medical Depot, Inc. ("Medical Depot") seeks a declaration and damages from its D&O liability insurer, Defendant RSUI Indemnity Company ("RIC"), regarding insurance coverage for a class action lawsuit. RIC and Medical Depot entered into two claims-made D&O insurance policies – one for the June 15, 2013–June 15, 2014 policy period (Policy No. NHP652042, the "Policy"), and a renewal of the Policy for the June 15, 2014–June 15, 2015 policy period (Policy No. NHP657653, the "Renewal Policy").

On June 18, 2013, Tony Mezzadri sent Medical Depot a letter (the "Demand Letter"). In the Demand Letter, Mr. Mezzadri threatened to file a class action lawsuit against Medical Depot if it did not bring itself into compliance with California law. In March 2014, Mr. Mezzadri filed his initial complaint (the "Initial Complaint"), demanding injunctive and monetary relief. Although Mr. Mezzadri failed to serve the Initial Complaint on Medical Depot, Medical Depot obtained from its counsel a copy of the unserved Initial Complaint. Three months later, Mr. Mezzadri amended the Initial Complaint (the "Amended Complaint"). On September 2, 2014, Mr. Mezzadri served the Amended Complaint on Medical Depot during the Renewal Policy's policy period. Medical Depot notified RIC of the Amended Complaint on September 9, 2014. RIC denied coverage. Medical Depot contends RIC has a duty to defend it against the underlying class action lawsuit under both policies as a matter of law.

As set forth below, the Court finds that the Demand Letter does not constitute a "Claim" under the Policy or the Renewal Policy. The Court also finds that the Initial Complaint constitutes a Claim under the Policy because it is a written demand for monetary relief. Because the Initial Complaint constitutes a Claim under the Policy, the Court must find that Medical Depot did not provide "Notice" as provided in the Policy's express terms. These findings, however, do not end the inquiry as to whether coverage exists for the Claim. The Court finds that the Claim falls within the Policy's coverage period as part of the "Claims-made relationship" of the Policy, and the fact that the Policy was renewed. The Court cannot, however, grant full summary judgment to either party because a question of fact may remain as to what prejudice, if any, RIC suffered as a result Medical Depot's untimely notice.

# FACTUAL AND PROCEDURAL BACKGROUND

## BACKGROUND FACTS

Medical Depot is a Delaware corporation. Medical Depot manufactures and distributes medical devices, including a full-body sling.[1] RIC is an insurance company organized under the laws of New Hampshire, with its principal place of business in Atlanta, Georgia.[2] RIC is licensed to do business in Delaware.[3] RIC provided D&O liability coverage to Medical Depot under two policies: (i) the Policy – policy period June 15, 2013–June 15, 2014; and, (ii) the Renewal Policy – policy period June 15, 2014–June 15, 2015.[4]

On June 18, 2013, Mr. Mezzadri's counsel wrote a letter to Medical Depot (previously defined as the "Demand Letter"). Mr. Mezzadri alleged Medical Depot misrepresented the quality of its full-body sling.[5] The Demand Letter stated:

> In order to avoid future harm, Mr. Mezzadri demands that [Medical Depot] immediately cease representations that its slings are "carefully inspected prior to shipment," "built to exacting standards," and will provide "years of dependable service." Moreover, Mr. Mezzadri demands that [Medical Depot] make clear that, while the mesh body of its slings is made from polyester, the straps are made from polypropylene. And, of course, Mr. Mezzadri demands that [Medical Depot] not replace those misrepresentations with other tales or misleading representations.
>
> To rectify harms to past consumers, Mr. Mezzadri demands that [Medical Depot] undertake the measures set forth in Civil Code section 1782, subdivision (c)(1)–(4).[6] This will require [Medical Depot] to identify all prior consumers who have

---

[1] Plaintiff's Complaint ("Pl.'s Compl.") ¶5.
[2] *Id.* ¶6.
[3] *Id.*
[4] *Id.* ¶¶10–11.
[5] Pl.'s Compl. ¶21.
[6] CAL. CIV. CODE § 1782(c) (West 2016) ("No action for damages may be maintained under Section 1781 upon a showing by a person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 that all of the following exist: (1) All consumers similarly situated have been identified, or a reasonable effort to identify such other consumers has been made; (2) All consumers so identified have been notified that upon their request the person shall make the appropriate correction, repair, replacement, or other remedy of the goods and services; (3) The correction, repair, replacement, or other remedy requested by the consumers has been, or, in a reasonable time, shall be, given; (4) The person has ceased from engaging, or if immediate cessation is impossible or unreasonably expensive under the circumstances, the person will, within a reasonable time, cease to engage, in the methods, act, or practices.")

purchased a [Medical Depot] sling within a reasonable time, notify them of their right to request an appropriate remedy from you, and then provide that remedy within a reasonable time to any consumers who request it. In Mr. Mezzadri's view, an "appropriate remedy" under the circumstances would consist of a full refund of the sling purchase price, including any shipping charges and sales tax reimbursement.[7]

Mr. Mezzadri stated that he intended to file a class action lawsuit if Medical Depot failed to meet these conditions. The Court notes that the Demand Letter makes no request for monetary relief or explicitly demands that Medical Depot pay Mr. Mezzadri and "past consumers" any money.[8]

On March 27, 2014, Mr. Mezzadri filed a lawsuit against Medical Depot, styled *Tony Mezzadri v. Medical Depot, Inc., d/b/a Drive Medical Design and Manufacturing*, Case No. 37-2014-00008838-CU-BT-CTL, in the Superior Court of California, County of San Diego ("Initial Complaint").[9] This is the Initial Complaint. Mr. Mezzadri never served the Initial Complaint on Medical Depot.[10] However, Medical Depot's Director of Human Resources and President were notified of the Initial Complaint's existence on or about March 31, 2014 by Medical Depot's general counsel.[11]

On June 12, 2014, Mr. Mezzadri filed an Amended Complaint.[12] This filing occurred three days prior to June 15, 2014 which is the end of the Policy's "Policy Period."[13]

Medical Depot and RIC renewed the Policy by way of the Renewal Policy. As stated above, the policy period for the Renewal Policy is June 15, 2014 through June 15, 2015.

---

[7] RIC Indemnity Company's Op. Br. in Supp. of its Mot. for Summ. J. (Def.'s Br.), App'x at A199-200.
[8] *Id.* The Court does understand that Mr. Mezzadri contends that one "appropriate remedy" would be a full refund of the sling's purchase price, shipping and handling. Mr. Mezzadri, however, does not state that payment be made. Instead, Mr. Mezzadri demands that Medical Depot notify past consumers of "their right to request an appropriate remedy from you, and then provide that remedy within a reasonable time to any consumers who request it."
[9] Pl.'s Compl. ¶24.
[10] *Id.*
[11] Mem. of Law in Supp. of Pl. Medical Depot, Inc.'s Mot. for Summ. J. ("Pl.'s Br."), Ex. E, p. 2, n.1.
[12] *Id.* ¶25.
[13] Def.'s Br. App'x at A002.

4

Accordingly, RIC is the claims-made D&O insurer for Medical Depot for the period of June 15, 2013 through June 15, 2015.

Medical Depot was served on September 2, 2014, within the Renewal Policy's coverage timeline.[14] Medical Depot notified RIC of the Amended Complaint on September 9, 2014.[15]

RIC denied coverage on three separate occasions: September 18, 2014; October 20, 2014; and December 29, 2014.[16] RIC stated bases for the denials relate to the timeliness of Medical Depot's written notice of the claim by Mr. Mezzadri. First, Medical Depot allegedly failed to timely notify RIC of the Demand Letter. Second, the three underlying events (Demand Letter, Initial Complaint, and Amended Complaint) all relate to the same set of facts: Medical Depot allegedly misrepresented the sling's quality. RIC contends that the Initial Complaint and the Amended Complaint claims relate back to the untimely-notified Demand Letter. Last, Medical Depot's Human Resources Director's knowledge of the Initial Complaint triggered Medical Depot's duty to notify RIC pursuant to the Notice Provision; Medical Depot's failure to timely notify RIC obviated RIC's duty to defend.[17]

The parties did not provide facts to the Court regarding what, if any, prejudice RIC suffered as a result of receiving notice of Mr. Mezzadri's claim on September 9, 2014.

**RELEVANT PORTION OF INSURANCE POLICIES**

The Court has reviewed the Policy and the Renewal Policy provided by the parties in briefing. The Court believes the following sections of the Policy to be the most relevant. From the "New York – Amendatory:"

This endorsement modifies insurance provided under the following:

---

[14] *Id.*
[15] *Id.* ¶28.
[16] Pl.'s Br. Exs. D–F.
[17] *See, e.g., Id.* Ex. D, at 2–3.

**DIRECTORS AND OFFICERS LIABILITY POLICY – PRIVATE COMPANY**

1.　　SECTION I. – INSURING AGREEMENTS, A., B. and C. are deleted and replaced by the following:

A.　　With the **Insured Person** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period**, or any subsequent renewal of this policy or during any applicable extension period and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of this policy, the Insurer will pay on behalf of such **Insured Person** all **Loss** such **Insured Person** is legally obligated to pay, except and to the extent that the **Insured Organization** is required or permitted to indemnify such **Insured Persons**.

B.　　With the **Insured Organization** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period**, or any subsequent renewal of this policy or during any applicable extension period and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person**.

C.　　With the **Insured Organization** that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period**, or any subsequent renewal of this policy or during any applicable extension period and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

2.　　SECTION III. – DEFINITIONS, B. **Claim** is deleted and replaced by the following:

B.　　**Claim**, either in the singular or the plural, means:
　　　1.　　A written demand for monetary relief;

　　　2.　　A civil, criminal, administrative, regulatory or arbitration proceeding for monetary relief which is commenced by:
　　　　　a.　　Service of a complaint or similar pleading;
　　　　　b.　　Return of an indictment (in the case of a criminal proceeding); or
　　　　　c.　　Receipt of a notice of charges;

　　　3.　　An administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or similar state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

3.      SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance is deleted and replaced by the following:

C.      **Notice of Claim or Circumstance**

1.      If, during the **Policy Period** or Discovery Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the Insured give written notice of such **Claim** to the **Insurer** (via certified mail at the address shown on the Declarations Page), as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than thirty (30) days after either the expiration date or any earlier cancellation date of this policy.

2.      If, during the **Policy Period** or Discovery Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** and, as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice (via certified mail at the address shown on the Declarations Page), of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**. The written notice shall include, at a minimum:
   a.      The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and
   b.      The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

3.      Notice given by or on behalf of the **Insured Persons**, or written notice by or on behalf of the injured party or any other claimant, to any licensed agent of the **Insurer** in the state of New York, with particulars sufficient to identify the **Insured**, shall be deemed notice to the **Insurer**. Failure to give any notice within the time prescribed herein shall not invalidate any **Claim** made by the **Insured** or by any other claimant if it shall be shown not to have been reasonably possible to give such notice within the prescribed time period and notice was given as soon as was reasonably possible.[18]

---

[18] Def.'s Br. App'x at A024-A025. RIC also cites to an earlier section of the Policy which is substantially similar but has a sixty (60) day period in the "Notice of Claim or Circumstance" subsection. *Id.* at A007. The plain language of the Policy, however, provides that this New York – Ambulatory endorsement modifies the earlier language in the Policy. However, the Policy also contains another Notice provision that may have been superseded. *Id.* at A051. The Court thinks it interesting that RIC does not know the controlling provision. The Court does not believe it makes a difference here as to the number of day (thirty (30) versus sixty (60)). It could make a difference as to knowledge on the part of Medical Depot because A024-A025, unlike A007, does not reference "the Insured's CEO, CFO, GC, or HR Director first becomes aware of the Claim…" *Compare id.* at A007 with A024-25 and A051.

7

Another relevant section of the Policy is the "New York Regulation 121 Disclosure Supplement" This section provides:

> The words "Us" and "We" as used in this Supplement means the Company issuing the Policy. "You" or "Your" means the Insured named on the Declarations Page of the Policy.
>
> 1.  **Claims-Made Relationship**
>
>     "Claims-made Relationship" means the period of time between the effective date of the first claims-made policy between Us and You and the cancellation and nonrenewal of the last consecutive claims-made policy between Us and You, where there has been no gap in coverage and does not include any period covered by Discovery Period coverage. During the first several years of this "claims-made relationship", claims-made rates are comparatively lower than rates for occurrence policies. However, You can expect substantial annual premium increases; independent of overall rate level increases, until the "claims made relationship" reaches maturity.
>
> 3.  **Claims-Made Policy**
>
>     Under a Claims-Made policy, coverage is provided for liability ONLY IF THE CLAIM FOR DAMAGES IS FIRST MADE AGAINST THE INSURED AND REPORTED TO US IN WRITING DURING THE POLICY PERIOD, ANY SUBSEQUENT RENEWAL AND ANY APPLICABLE DISCOVERY PERIOD. All coverage ceases upon termination of this policy, except for the Automatic Discovery Period, and if You purchase an Optional Discovery Period.[19]

The Court also finds relevant to the parties' arguments a portion of the "Limitation, Retention, Payment of Loss" section of the Policy. This subsection provides the following:

> 3.  All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this policy, shall be subject to the Retention stated in Item 4. of the Declarations Page, and shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.[20]

---

[19] Def.'s Br. App'x at A040.
[20] *Id* at A050.

The Policy does contain a choice of law provision.  This provision is entitled "Governing Law Clause and provides:

S.      Governing Law Clause

This policy shall, to the extent permitted by applicable law, be construed in accordance with the laws of the state or jurisdiction of incorporation or organization of the **Insured Organization** or, in the case of matters pertaining to a **Subsidiary**, the laws of the state or jurisdiction of incorporation or organization thereof.[21]

**PROCEDURAL STATUS**

On April 14, 2015, Medical Depot filed this action.  On June 4, 2015, RIC answered.  On January 21, 2016, the parties stipulated to stay discovery and establish a cross-summary judgment briefing schedule.[22]  On February 10, 2016, Medical Depot filed its Memorandum of Law in Support of Plaintiff Medical Depot, Inc.'s Motion for Summary Judgment ("Medical Depot Motion" or "Pl.'s Br."), and Defendant filed RSUI Indemnity Company's Opening Brief in Support of its Motion for Summary Judgment ("RIC Motion" or "Def.'s Br.").  On March 9, 2016, Medical Depot filed its Plaintiff Medical Depot, Inc.'s Answer to Defendant RSUI Indemnity Company's Motion for Summary Judgment ("Pl's, Opp."), and Defendant filed its RSUI Indemnity Company's Brief in Response to Medical Depot Inc.'s Motion for Summary Judgment ("Def.'s Opp.").  On March 23, 2016, Medical Depot filed its Plaintiff Medical Depot, Inc.'s Reply to Defendant RSUI Indemnity Company's Brief in Response ("Pl.'s Rep."), and Defendant filed RSUI Indemnity Company's Reply Brief in Support of its Motion for Summary Judgment ("Def.'s Rep.").  The Court heard oral argument on June 22, 2016.  At the end of the hearing, the Court took the matters under advisement and reserved decision.

---

[21] *Id*. at A054.
[22] Stipulation Revising Section IV of the Case Management Order, Jan. 21, 2016 (D.I. 26).

This is the Court's decision on the Medical Depot Motion and the RIC Motion. For the reasons set forth below, the Court will **GRANT** in part and **DENY** in part both the Medical Depot Motion and the RIC Motion.

## LEGAL STANDARD

Summary judgment is granted only if the moving party establishes that there are no genuine issues of material fact in dispute and judgment may be granted as a matter of law.[23] All facts are viewed in a light most favorable to the non-moving party.[24] Summary judgment may not be granted if the record indicates that a material fact is in dispute, or if there is a need to clarify the application of law to the specific circumstances.[25] When the facts permit a reasonable person to draw only one inference, the question becomes one for decision as a matter of law.[26] If the non-moving party bears the burden of proof at trial, yet "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment may be granted against that party.[27]

Where the parties have filed cross motions for summary judgment and have not argued that there are genuine issues of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[28] Neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law.[29]

---

[23] Super. Ct. Civ. R. 56(c).
[24] *Burkhart v. Davies*, 602 A.2d 56, 58–59 (Del. 1991).
[25] Super. Ct. Civ. R. 56(c).
[26] *Wooten v. Kiger*, 226 A.2d 238, 239 (Del. 1967).
[27] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[28] Super. Ct. Civ. R. 56(h).
[29] *E.I. DuPont de Nemours and Co. v. Medtronic Vascular, Inc.*, 2013 WL 261415, at *10 (Del. Super. Jan. 18, 2013).

## MEDICAL DEPOT'S CONTENTIONS

Medical Depot contends that the Amended Complaint is the only claim under the policies. Medical Depot contends the Demand Letter is not a claim because Mr. Mezzadri did not demand monetary relief. Further, Medical Depot contends Mr. Mezzadri's Initial Complaint is not a claim because it was never served on Medical Depot.

Medical Depot also contends that both the Policy and the Renewal Policy cover this claim. The policies' insuring agreement endorsements state:

> [I]f a Claim for a Wrongful Act is first made against the Insured Organization during the Policy Period, or any subsequent renewal of this policy or during any applicable extension period and reported in accordance with [the Notice Provision] of this policy, the Insurer will pay on behalf of the Insured Organization all Loss the Insured Organization is legally obligated to pay.[30]

Medical Depot argues that the claim was made during the Renewal Policy's policy period, triggering the aforementioned clause. Alternatively, Medical Depot contends the claim triggers the Policy because the claim was made during a subsequent renewal of the Policy and reported to RIC in accordance with the Notice Provision.

## RIC'S CONTENTIONS

RIC contends Medical Depot did not timely notify RIC of the Demand Letter. Second, RIC contends that the Initial Complaint is a written demand for monetary relief and a civil suit. Medical Depot's HR Director knew about Mr. Mezzadri's unserved Initial Complaint. Medical Depot is not entitled to coverage for failure to timely notify RIC. Third, RIC contends Mr. Mezzadri's Amended Complaint relates back to the Demand Letter. RIC contends the Amended Complaint involves the same facts as the Demand Letter. RIC argues that because Medical Depot never timely notified RIC of the Demand Letter, it cannot notify RIC of a later, related claim.

---

[30] Def.'s Br. App'x at A024; *see also id.* at A086.

Alternatively, RIC argues no coverage exists because Mr. Mezzadri's claim relates back to a similar action. In 2011, Karen Swisher filed a wrongful death, products liability, and negligence lawsuit against Medical Depot in the Superior Court of California in and for the County of San Diego.[31] Ms. Swisher alleged her husband suffered fatal head trauma when multiple straps on his full-body sling failed. Ms. Swisher further alleged that Medical Depot intentionally and/or recklessly advertised that the slings were made of strong polyester, rather than weaker polypropylene. RIC alleges that Mr. Mezzadri's class action lawsuit relates back to Ms. Swisher's wrongful death claim because there is an overlap in several misrepresentations: both allege defective medical straps and intentional misrepresentation about the straps' capabilities.

## DISCUSSION

A.    DELAWARE CONTRACT INTERPRETATION

Initially, the Court holds that Delaware law applies in this case. The policies' governing law provision states:

> This policy shall, to the extent permitted by applicable law, be construed in accordance with the laws of the state or jurisdiction of incorporation or organization of the Insured Organization[.][32]

In Delaware, the Court will recognize the choice of law agreed upon by the parties in the contract if the choice of governing law bears some material relationship to the transaction.[33] Medical Depot is a Delaware corporation. Moreover, this case involves a D&O policy for a Delaware corporation. The Court understands that Medical Depot's principal place of business is in New York; however, Delaware law bears a material relationship to the transaction.

---

[31] *Id.* at A311–332.
[32] *Id.* at A054; *see also id.* at A116.
[33] *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1293 (Del. 1989).

Insurance policies "are construed as a whole, to give effect to the parties' intentions."[34] In other words, the Court is to interpret the insurance policy through a reading of all of the relevant provisions of the contract as a whole, "and not on any single passage in isolation."[35] Moreover, an interpretation that gives effect to all the terms of an insurance policy is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive.[36] The Court is also to interpret an insurance policy in a manner that does not render any provisions "illusory or meaningless."[37]

Where the language of an insurance policy is "clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[38] Ambiguous insurance policy language is construed in the insured's favor – *i.e.*, under the doctrine of *contra proferentem*, the language of an insurance policy must be construed most strongly against the insurance company that drafted the policy.[39] This is because insurance contracts are contracts of adhesion.[40] An insurance policy is ambiguous when the provisions at issue "are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[41] An insurance policy is not ambiguous merely because the parties do not agree on the proper construction.[42]

---

[34] *AT&T Corp. v. Faraday Capital Ltd.*, 918 A.2d 1104, 1108 (Del. 2007).
[35] *O'Brien v. Progressive Northern Ins.*, 785 A.2d 281, 287 (Del. 2001).
[36] *Id.*
[37] *Id.* (*quoting* from *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. Super. 1992)).
[38] *Faraday Capital Ltd.*, 918 A.2d at 1108.
[39] *O'Brien*, 785 A.2d at 288; *see also Weiner v. Selective Way Ins. Co.,* 793 A.2d 434, 440 (Del. Super. 2002).
[40] *See State Farm Mut. Auto. Ins. Co. v. Johnson*, 320 A.2d 345, 347 (Del. 1974)(holding that an insurance contract is "an adhesion contract, not a truly consensual agreement.").
[41] *Weiner,* 793 A.2d at 440.
[42] *O'Brien*, 785 A.2d at 288.

Coverage language is interpreted broadly to protect the insured's objectively reasonable expectations.[43] Exclusionary clauses, on the other hand, are "accorded a strict and narrow construction."[44] Even so, courts will give effect to exclusionary language where it is found to be "specific," "clear," "plain," "conspicuous" and "not contrary to public policy."[45] The Court also recognizes that case law exists that permits judicial application of the reasonable expectation doctrine to fulfill an insured's expectations even where those expectations contravene the unambiguous, plain meaning of exclusionary clauses.[46]

**B.     THE INITIAL COMPLAINT CONSTITUTES A CLAIM UNDER THE POLICY**

**a.     THE DEMAND LETTER IS NOT A CLAIM PER THE POLICIES' WRITTEN TERMS**

The policies define a claim as, *inter alia*, a written demand for monetary relief.  The Demand Letter is not a written demand for monetary relief.  The Demand Letter does demand that Medical Depot bring its operations into compliance with applicable state law.  It also demands that Medical Depot stop marketing its products incorrectly.  Mr. Mezzadri used the word demand four times in his Demand Letter.  But, Mr. Mezzadri never demanded money.  The Court does understand that Mr. Mezzadri goes on at one point and contends that one "appropriate remedy" could be a full refund of the sling's purchase price, shipping and handling.  Mr. Mezzadri, however, does not state that payment be made.  Instead, Mr. Mezzadri demands that Medical Depot notify past consumers of "their right to request an appropriate remedy from you, and then provide that remedy within a reasonable time to any consumers who request it."

---

[43] *AT&T Corp. v. Clarendon Am. Ins. Co.*, C.A. No. 04C-11-167(JRJ), 2006 WL 1382268, at *9 (Del. Super. April 25, 2006), *rev'd in part on other grounds*, *AT&T Corp. v. Fraday Capital Ltd.*, 918 A.2d 1104 (Del. 2007).
[44] *Id.*
[45] *Id.*
[46] *Id.*at *9, n. 123 (citing and reviewing cases that utilized the "reasonable expectation doctrine").

*First Bank of Delaware v. Fidelity and Deposit Company of Maryland*[47] discussed an

example of a "written demand letter for monetary relief."  In *First Bank,* plaintiff sued its insurer

for the insurer's failure to cover assessments plaintiff paid to Visa and MasterCard.  Visa notified

plaintiff that Visa owed approximately $1.38 million for losses on October 30, 2009.[48]  Plaintiff

then reimbursed Visa and MasterCard for losses occurred during a data breach.

Plaintiff and the insurance company filed cross-motions for summary judgment.  Plaintiff

contended its insurer had to pay for the loss due to the policy's language.  The policy's payments

provision stated:  "The Insurer will pay on behalf of the insured all loss resulting from [a written

demand for monetary damages] first made against the Insured during the policy period. . ...."[49]

The *First Bank* Court found that Visa's October 30, 2009 letter to Plaintiff constituted a policy-

triggering "claim" because it was a written demand for monetary damages.[50]

RIC tacitly admits the Demand Letter is not a claim for monetary relief due to

California's Civil Code.[51]  As a condition precedent to the filing of any civil suit, Mr. Mezzadri

first had to request equitable relief pursuant to California Civil Code Section 1782.[52]  Mr.

Mezzadri's Demand Letter may have been a precursor to a lawsuit for monetary relief; however,

that letter could not be a written demand for monetary relief.  At most, the Court finds that the

Demand Letter is a demand that constituted a fact or circumstance "which may reasonably be

expected to give rise to a Claim against" Medical Depot.  Such a "fact or circumstance" does not

implicate the notice deadline provisions of the Policy and, instead, deals with a situation where a

---

[47] 2013 WL 5858794 (Del. Super. Oct. 30, 2013).
[48] *Id.* at *2.
[49] *Id.* at *3.
[50] *Id.* at *4.
[51] *See* Def.'s Rep. at 10–11 ("[B]efore Mr. Mezzadri could commence the Mezzadri Action, he was required [by Civil Code 1782] to notify Medical Depot and demand a remedy[.]").
[52] *See Benson v. S. California Auto Sales, Inc.,* 192 Cal. Rptr. 3d 67, 72 (Cal. Ct. App. 2015) (citing *Morgan v. AT & T Wireless Services, Inc.*, 99 Cal.Rptr.3d 768, 788 (Cal. Ct. App. 2009)) ("[Section 1782's notice] requirement exists in order to allow a defendant to avoid liability for damages if the defendant corrects the alleged wrongs within 30 days after notice, or indicates within that 30–day period that it will correct those wrongs within a reasonable time.").

"Claim" made after the expiration date of the Policy would relate back to a time during the Policy Period.[53]

> **b.** **THE MARCH 27, 2014 INITIAL COMPLAINT IS A CLAIM UNDER THE PLAIN LANGUAGE OF THE POLICY**

RIC alleges that the Initial Complaint is a Claim because it is a written demand for monetary damages. Although the Initial Complaint was unserved, Medical Depot's Human Resources Director knew about the filing of that complaint, learning of its existence from Medical Depot's counsel.[54] RIC argues that the Initial Complaint is a Claim as it is a written demand for monetary relief and that Medical Depot's failure to provide timely notice obviated RIC's duty to defend. Medical Depot counters by arguing that the Policy provides, when a civil action is involved, that a "Claim" does not exist until after service of the Initial Complaint (which did not occur), or, as here, the service of the Amended Complaint.

The Court holds that RIC's position is supported by the plain language of the Policy. In addition to a written demand for monetary relief, the Policy also defines a Claim as a "civil proceeding for monetary relief which is commenced by Service of a complaint or similar pleading."[55] The parties do not dispute that Mr. Mezzadri never served the Initial Complaint on Medical Depot. The parties, however, do not contend that the Initial Complaint failed to demand monetary relief from Medical Depot, or that the Initial Complaint was not in writing. The Policy states that a Claim can be a written demand, a served complaint or a notice of charges. The Policy does not exclude an unserved complaint for monetary damages from the definition of Claim. While the Initial Complaint had not been served, the Initial Complaint is a written demand for monetary relief.

---

[53] Def.'s Br. App'x at A007, A024-25 and/or A051.
[54] *Id*. at A215.
[55] *Id*. at A024; *see also id.* at A086.

16

Neither party cited Delaware case law on this issue. RIC cited *HealthSmart Benefit Solutions, Inc. v. Principia Underwriting*[56] for the proposition that an initial complaint can constitute a written demand for monetary relief. In *HealthSmart*, plaintiff sought coverage for an underlying lawsuit from its claims-made professional liability insurer, Flectat.[57] The policy period was December 31, 2012–December 31, 2013.[58] Plaintiff was added to the underlying lawsuit on December 18, 2013, and served on January 15, 2014.[59]

The *HealthSmart* policy defined a claim as "a written demand or service of civil proceedings by one or more claimants seeking any of the following: monetary damages, injunctive relief, retraction or correction, arbitration or mediation."[60] Flectat moved for summary judgment on its denying coverage, asserting that the claim occurred when plaintiff was served, after the policy expired.[61] Plaintiff argued that the amended complaint was a "written demand," and covered by the policies. So, the policy covered the claim.[62]

The *HealthSmart* Court agreed with the plaintiff and held that the amended complaint constituted a written demand. The *HealthSmart* Court noted that while the insurance policy defined "claim" as service of civil proceedings, the definition also lists a "written demand" against the insured.[63] The *HealthSmart* Court then went on to deny Flectat's motion, holding that the written demand does not require that the insured "discover, receive, be served, or otherwise [be] provided" the demand.[64] The court stated the definition merely acknowledges the

---

[56] 2015 WL 339524 (W.D. La. Jan. 23, 2015).
[57] *Id.* at *1.
[58] *Id.*
[59] *Id.*
[60] *Id.* at *2.
[61] *Id.* at *3.
[62] *Id.*
[63] *Id.*
[64] *Id.*

17

distinction between the date a claim is made against the insured and the date the insurer receives written notice of the claim.[65]

Few Delaware Courts have analyzed scenarios in which a "claim" can fall under two definitions. In *United Westlabs, Inc., et al., v. Greenwich Insurance Company, et al.*,[66] plaintiffs ("UWL") sought coverage from their insurers regarding a dispute with another entity, Seacoast Laboratory Data Systems ("Seacoast"). UWL sued Seacoast for breach of contract. Seacoast filed counterclaims.

UWL obtained coverage from Greenwich.[67] The Greenwich policy defined a claim as "(1) any written notice received by an insured that any person or entity intends to hold any Insured responsible for a Wrongful Act, including any such notice seeking monetary or non-monetary relief; or (2) any civil proceeding in a court of law or equity, or arbitration."[68] The *United Westlabs* Court held that Seacoast's counterclaims constituted a claim under both Greenwich claim definitions: it was a civil proceeding and a written notice.[69]

In *Hurley v. Columbia Cas. Co.*,[70] an underlying lawsuit's complaint was forwarded directly to Hurley, hoping to spur out-of-court settlement discussions.[71] Plaintiffs sought coverage from their D&O insurer.[72] The policy's claim definition was: (1) a civil, criminal or administrative adjudicatory proceeding, or (2) a written demand for monetary damages.[73]

---

[65] *Id.*
[66] 2011 WL 2623932 (Del. Super. Jul. 1, 2011).
[67] *Id.* at *4.
[68] *Id.*
[69] *Id.* at *13.
[70] 976 F.Supp. 268 (D. Del. 1997).
[71] *Id.* at 270.
[72] *Id.*
[73] *Id.* at 274.

18

Notably, the claim definition did not require service. The parties ultimately stipulated that the draft complaint constituted a written demand for monetary damages.[74]

The Court agrees with the straightforward analysis used in *United Westlabs* and *HealthSmart*. The Initial Complaint is a written demand and, if it had been served, it also would have constituted a civil proceeding commenced by service of a complaint.

### c. THE JUNE 12, 2014 AMENDED COMPLAINT IS A CLAIM

The parties agree Medical Depot was served with the Amended Complaint on September 2, 2014. The parties also agree that Medical Depot notified RIC on September 9, 2014. Pursuant to the policies' plain terms, the Amended Complaint is a Claim.

### d. UNLESS RIC CAN SHOW PREJUDICE, MEDICAL DEPOT IS ENTITLED TO COVERAGE UNDER THE POLICY EVEN THOUGH MEDICAL DEPOT DID NOT PROVIDE NOTICE "AS SOON AS PRACTICABLE" AS THE POLICY WAS RENEWED AND MEDICAL DEPOT PROVIDED NOTICE DURING THE SUBSEQUENT RENEWAL OF THE POLICY.

The Policy is a claims-made policy. The distinction between an occurrence policy and a claims-made policy relates to the insured risk.[75] In an occurrence policy, the insured risk is the "occurrence" itself. Once the occurrence takes place, coverage will attach even though the claim may not be made until some later date.[76] In a claims-made policy, it is the making of the "claim" which is the event and risk being insured and, subject to policy terms, regardless of when the "occurrence" took place.[77]

As stated in *Homsey Architects, Inc. v. Harry David Zutz Ins., Inc.*:

The purpose of a claims-made policy is to minimize the time between the insured event and the payment. For that reason, the insured event is the claim being made against the insured during the policy period and the claim being reported to the

---

[74] *Id.*

[75] *Homsey Architects, Inc. v. Harry David Zutz Ins., Inc.*, C.A. No. 96C-06-082-JOH, 2000 WL 973285. at *12 (Del. Super. May 25, 2000).

[76] *See id.* at 2000 WL 973285, at *13.

[77] *See id.*

19

insurer within that same period or a slightly extended, and specified, period. If a claim is made against an insured, but the insurer does not know about it until years later, the primary purpose of insuring claims rather than occurrences is frustrated. Accordingly, the requirement that notice of the claim be given in the policy period or shortly thereafter in the claims-made policy is of the essence in determining whether coverage exists. Prejudice for an untimely report in this instance is not an appropriate inquiry.[78]

The reasoning of *Homsey Architects, Inc.*, and the cases reviewed and relied upon in that decision, is not implicated here. The Policy provides two important additional insurance policy sections and one important additional fact. The fact is that the Policy was renewed.[79] The relevant insurance policy sections are contained in "New York Regulation 121 Disclosure Supplement." These sections are:

The words "Us" and "We" as used in this Supplement means the Company issuing the Policy. "You" or "Your" means the Insured named on the Declarations Page of the Policy.

1.     **Claims-Made Relationship**

"Claims-made Relationship" means the period of time between the effective date of the first claims-made policy between Us and You and the cancellation and nonrenewal of the last consecutive claims-made policy between Us and You, where there has been no gap in coverage and does not include any period covered by Discovery Period coverage.

During the first several years of this "claims-made relationship", claims-made rates are comparatively lower than rates for occurrence policies. However, You can expect substantial annual premium increases; independent of overall rate level increases, until the "claims made relationship" reaches maturity.

3.     **Claims-Made Policy**

Under a Claims-Made policy, coverage is provided for liability ONLY IF THE CLAIM FOR DAMAGES IS FIRST MADE AGAINST THE INSURED AND REPORTED TO US IN WRITING DURING THE POLICY PERIOD, ANY SUBSEQUENT RENEWAL AND ANY APPLICABLE DISCOVERY PERIOD.

---

[78] *Id.*, 2000 WL 973285, at *12 (*quoting* from *Charles T. Main v. Fireman's Fund Ins. Co.*, 551 N.E.2d 28, 30 (Mass 1990)).
[79] Def.'s Br. App'x at A119-A129.

20

All coverage ceases upon termination of this policy, except for the Automatic Discovery Period, and if You purchase an Optional Discovery Period.[80]

The clear import of these two disclosures is that RIC agreed to extend coverage when there is a "claims-made relationship" with Medical Depot. The claims-made relationship between RIC and Medical Depot is June 15, 2013 through June 15, 2015. Accordingly, there should be no gap in coverage for Medical Depot between June 15, 2013 and June 15, 2015. Moreover, the "Claims-Made Policy" disclosure supplement provides that coverage exists if a Claim is made and reported to RIC by Medical Depot during the "policy period, any subsequent renewal and any applicable discovery period."

As discussed above, the Initial Complaint constitutes a Claim under the Policy. Medical Depot knew of the Initial Complaint on or about March 31, 2014. Medical Depot, however, did not provide notice to RIC of the underlying civil action until September 9, 2014 – seven days after Medical Depot was served with the Amended Complaint on September 2, 2014.

The Court finds that Medical Depot did not comply with the notice provisions of the Policy. Medical Depot did not provide RIC with notice of the written demand for monetary relief (the Initial Complaint) "as soon practicable" or within thirty (30) days – or even sixty (60) days – of the expiration date. But, Medical Depot did provide notice within "any subsequent renewal." As the Policy provides, RIC and Medical Depot are in a claims-made relationship, without gaps in coverage and Medical Depot did report Mr. Mezzadri's Claim during any "subsequent renewal" of the Policy.

In Delaware, an insurance policy is to be read in accord with the reasonable expectations of the insured.[81] This is true "so far as the language" of the insurance policy

---

[80] *Id.* at A040.

21

permits.[82]  Clearly, the Policy and the Renewal Policy create a two year period of claims-made insurance coverage.  This is the claims-made relationship.  Given the express language of the Policy and the fact that the Policy was renewed, Medical Depot has every right to expect that Claims made during the claims-made relationship will be covered.  RIC's arguments about this particular Claim – discovered but not reported during the Policy's policy period then reported during the Renewal Policy's policy period but not covered under either – defeats Medical Depot's reasonable expectation that Medical Depot would have extended policy coverage if it renewed the Policy.

Delaware law abhors forfeiture where to do so would deny the insured the very thing paid for.[83]  Medical Depot paid for claims-made coverage for the claims-made relationship spanning the period June 15, 2013 through June 15, 2015 with no gap in coverage.  RIC's purely technical position defeats the clearly contracted for relationship between the parties.

RIC argues that the provisions of the Policy and the Policy's Endorsements should control over the language in the "New York Regulation 121 Disclosure Statement."  For this argument, RIC relies on additional language in the "New York Regulation 121 Disclosure Supplement" that provides as follows:

> THIS SUPPLEMENTAL DISCLOSURE GENERALLY DISCUSSES CERTAIN IMPORTANT FEATURES OF THE POLICY.  PLEASE READ THE ENTIRE POLICY CAREFULLY AND DISCUSS IT WITH YOUR INSURANCE AGENT OR BROKER OR OTHER PROFESSIONAL INSURANCE ADVISOR.  THE PROVISIONS OF THE POLICY AND THE ENDORSEMENTS ATTACHED THERETO ARE CONTROLLING.[84]

---

[81] *State Farm Mut. Auto. Ins., Co. Johnson*, 320 A.2d 345, 347 (Del. 1974).
[82] *Id.*
[83] *Id.*
[84] Def.'s Br. App'x at A041.

RIC contends that this language means that the provisions of the "New York Regulation 121 Disclosure Statement" are overridden by the Policy's Notice of Claim or Circumstance provisions.

The Court disagrees. The Court must read the Policy's relevant provisions as a whole and not focus on any one single provision in isolation.[85] The Notice of Claim or Circumstance provisions would control in the event the Policy had not been renewed. But, the parties agreed that the Policy's coverage is extended in a situation where the Policy is renewed. Here, Medical Depot, with the agreement of RIC, renewed the Policy. The only place where extension of coverage is discussed in a renewal situation is in the "New York Regulation 121 Disclosure Statement." As such, the Policy's Provisions and Endorsements do not conflict with the disclosures of coverage made in the "New York Regulation 121 Disclosure Statement."

RIC claims that under Delaware law, an insurer does not have to show prejudice under a claims-made policy if the notice is untimely.[86] RIC contends that notice was untimely under both policies and, therefore, Medical Depot is not entitled to coverage.[87] In other words, RIC argues that Medical Depot has forfeited its paid for right to coverage because it provided notice of the Claim to RIC approximately eighty-two (82) days after June 15, 2014. And, this is true even though Medical Depot paid its premium on the Policy, renewed the Policy, entered into the Renewal Policy, paid a premium on the Renewal Policy and provided notice of the Claim during the renewal period of the Policy (which under the Renewal Policy is June 15, 2014 through June 15, 2015). However, the

---

[85] *O'Brien v. Progressive Northern Ins.*, 785 A.2d 281, 287 (Del. 2007).
[86] *Homsey Architects, Inc. v. Harry David Zutz Ins., Inc.,* 2000 WL 973285, at *12–13 (Del. Super. May 25, 2000).
[87] Def.'s Br. at *12–13.

case relied upon by RIC for this argument, *Homsey Architects, Inc. v. Harry David Zutz Ins. Inc.*, does not apply under the facts of this case.

*Homsey* is a case involving an untimely claim where coverage no longer was in place – the claims-made policy expired in 1993, the insured unilaterally resolved a claim in 1995 and the insured provided notice of the claim to the insurer in 1995. Here, the Court has found that coverage still existed at the time Medical Depot provided RIC notice of the Claim. The law since *Homsey* has developed to provide that in such circumstances, the insurer must demonstrate prejudice in order to prevail on an untimely notice argument.[88]

In *Antonacci v. Darwin Select Ins. Co.*, the court reviewed the state of the law as it related to untimely notice made under a claims-made insurance policy.[89] The *Antonacci* Court agreed with cases like *Homsey* which reason that to overlay a prejudice requirement on a claims-made policy where the claim is made outside the policy period, effectively converts the policy to an occurrence policy, for which the insured has neither bargained for nor paid for.[90] But, the *Antonacci* Court notes that to extend this rule to cases where the notice is untimely but within the policy period even when the insurer has not been prejudiced would, "in the words of Judge Cardozo, 'visit venial faults with oppressive retribution.'"[91]

---

[88] *See, e.g., Antonacci v. Darwin Select Ins. Co*., 49 Conn. L. Rptr. 692, 2010 WL 2108125, at *4 (Conn. Super. 2010)(engaging in analysis of decisions regarding late notice and claims-made policies); *see also Arrowood Indem. Co. v. King*, 39 A.3d 712 (Conn. 2012).

[89] *Antonacci*, 2010 WL 2108125, at*4.

[90] *Id.*

[91] *Id.*(quoting *Jacobs & Young, Inc. v. Kent*, 129 N.E. 889 (N.Y. 1921)); *cf. Johnson*, 320 A.2d at 347 (when discussing forfeiture in the case of an occurrence policy, holding that "…that when an insured fails in his burden of proving compliance with the notice condition, before any forfeiture can result, the insurer has the burden of showing that it has thereby been prejudiced.")

24

This Court agrees. The essence of a claims-made policy is notice to the insurer within the policy period. This allows the insurer certainty that when the policy period ends without a claim being made, the insurer will be exposed to no more liability. A claims-made policy also acts to minimize disputes with subsequent insurers as to when a triggering event as to coverage takes place. As stated in *Antonacci*, "[t]hese legitimate interests of the insurer will not be hindered by a requirement that it has to have suffered prejudice from a notice of claim, which, though untimely, is within the policy period. [92]

The Court has found that Medical Depot provided untimely notice of the Claim under the Policy. As discussed above, however, Medical Depot did provide notice within the period of coverage under the Policy. In this factual scenario, RIC must demonstrate that it was prejudiced by the untimely notice. As the parties have not provided a factual record regarding prejudice, the Court cannot grant full summary judgment in favor of either Medical Depot or RIC.

## C. EXCLUSIONS

To avoid coverage, RIC now has to show an exclusion applies. RIC makes two arguments: (i) claim backdating and (ii) similar act. The Court does not find either applies here.

### a. CLAIM BACKDATING

RIC contends that, if the Initial Complaint is a Claim, it relates back to the initial Demand Letter. Service of the Demand Letter occurred after notice requirement in the Policy. Therefore, RIC contends it does not have to provide coverage.

As discussed above, the Demand Letter is not a Claim under the terms of either the Policy or the Renewal Policy. The Initial Complaint, therefore, cannot relate-back to the Demand Letter.

---

[92] *Antonacci*, 2010 WL 2108125, at *4.

**b.**     SIMILAR ACT – THE *SWISHER* COMPLAINT

The Policy and the Renewal Policy contain identical "deemer clauses," which state:

> All Claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single Claim for all purposes under this policy, . . . and shall be deemed first made when the earliest of such Claims is first made, regardless of whether such date is before or during the Policy Period.[93]

This exact language was at issue in *RIC Indemnity Company v. Sempris, LLC.*[94] In *Sempris*, Sempris, LLC was sued by an individual for allegedly violating the Telephone Consumer Protection Act.[95] Sempris sought coverage from its D&O insurer, RIC.[96] RIC filed a declaratory action in this Court, seeking an order that it owed Sempris no insurance coverage, citing the same deemer clause found in this case.[97]

RIC contended four prior lawsuits involved similar facts or circumstances, precluding coverage for Sempris in the *Toney* lawsuit.[98] None involved alleged violations of the Telephone Consumer Protection Act. The *Sempris* Court found:

> [T]he Prior Lawsuits are not related to the *Toney* Lawsuit. The Prior Lawsuits all arise out of a plaintiff contacting a third-party product vendor, and in that same transaction, the third party enrolls the plaintiff in, and initiates billing for, membership in a Sempris Membership Program. . . .Toney placed an online order[, and] was contacted by [a third-party telemarketer]. . . .It is this initiation of contact . . .which gave rise to the *Toney* Lawsuit. Further, Ms. Toney never was enrolled in a Sempris Membership Program, separating her from the fraud-based claims of the Prior Lawsuits.[99]

---

[93] Def.'s Br. App'x at A050; *see also id.* A112.
[94] 2014 WL 4407717 (Del. Super. Sept. 3, 2014).
[95] *Id.* at *1.
[96] *Id.*
[97] *Id.*
[98] *Id.* at *4–6.
[99] *Id.* at *7.

The *Swisher* action and the *Mezzadri* action are different. The *Swisher* action was a wrongful death and products liability action.[100] Swisher sought redress for the sling's causing a death. The Initial Complaint and Amended Complaint are a class action lawsuit alleging violations of California's Business & Professions Code sections 17200 and 17500, and Civil Code 1750, *et seq.*[101] Mr. Mezzadri is seeking redress for buying the sling. Mr. Mezzadri never claimed that the sling caused him physical harm. The two actions are not fundamentally identical. Mr. Mezzadri's claim does not relate back to the *Swisher* action.

## CONCLUSION

For the foregoing reasons, Medical Depot's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part, and RIC Indemnity Company's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

The parties are to provide a status report to the Court within thirty (30) days of the date of this Opinion on whether (i) summary judgment motions on the issue of prejudice would resolve this civil action, or (ii) the Court should set the matter for trial on the factual issue of prejudice.

**IT IS SO ORDERED.**

/s/ *Eric M. Davis*
Eric M. Davis, Judge

---

[100] *See* Def.'s Br. App'x at A313–A328.
[101] *Id.* A136–A158 (Mr. Mezzadri's Amended State Court Complaint, filed June 12, 2014); *see also id.* at A335–A362 (Mezzadri's Second Amended District Court Complaint, filed March 4, 2015).